On Rehearing.
Monroe, J.
The pleadings and facts in this case are set forth in the original opinion, and need not be recapitulated.
The plea of res adjudícala rests upon the proposition that a license tax is a tax upon the capital of the bank, and hence that a judgment declaring such capital exempt from taxation establishes the “thing adjudged,” with respect to the present claim for a license.
Although this question can no longer be considered an open one, we have given the able presentation of it, by the learned counsel for defendant, our serious consideration. We find the authorities cited in the original opinion conclusive upon the subject, however, and 'they are binding upon this court. It may be remarked, in addition, that if exemption of capital, necessarily, or in the contemplation of law makers, carried with it the exemption of the occupation of the owner of the capital, it seems hardly, probable that the Constitutions and laws of this State would, for many years, have contained separate provisions upon those subjects.
*1095 In so far as concerns the judgment of the Supreme Court of the United States in the matter of “The State of Louisiana ex rel. Citizens’ Bank vs. Board of Assessors ” taken up by writ of error to this court and reported in 167 U. S., 407, that judgment affirms tho judgment of this court, as reported in 48 Ann., 35, to the effect that “Where the Citizens’ Bank subjects property to its ownership which was mortgaged to secure stock subscriptions, the property is not exempt from taxation, as part of the capital stock of the bank,” and nothing else was decided in that case. In the case entitled “City of New Orleans vs. Citizens’ Bank,’’ 167 U. S., 373, appealed from the Circuit Court of the United 'States, there were three questions presented and decided, viz:
1. The majority of the court, sustaining the plea of res adjudicata, held that the bank is not liable to taxation on its capital stock, or its banking house, or furniture, used for its business, and that it can not be required to pay a tax assessed upon its shares in the hands of its shareholders.
2. It was further held that the bank is liable to taxation on property acquired in foreclosure of mortgages.'
3. It was further decreed that the claim of the bank to the non-liability of its shareholders to taxation should be rejected, and the question left open.
4. And, finally, the court refused to sustain the proposition “that the non-liability of the bank to taxation embraced also immunity from the payment of a license :tax to either the State of Louisiana, or the City of New Orleans,” and held that the question of non-liability for such license tax was not in the case.
It is manifest, then, that, whether the bank is liable for a license tax, was not decided. On the other hand, it was decided that the question of immunity from taxation on capital does not embrace or include the question of immunity from a license tax. Again, the Circuit Court had held that the bank was exempt from taxation on mortgaged property, bought in by it, because the property so acquired became, by virtue of the purchase, a part of its capital stock. But the Supreme Court said: “Evidently it was a confusion of thought on this question, which led the court below to hold that the property bought in, in enforcement of the stock mortgages, and held by the bank, was the capital of the bank, and, therefore, not liable to taxation.”
*1096 It is said that, even though it be held that exemption from license taxation is not included in the language by which exemption from capital taxation is conferred, the court must, nevertheless, be convinced that it was the intention of the State that exemption from taxation, upon the business, or occupation, of the bank, should be included in the grant, for the reason, that, by the act of 1836, the bank acquired the character of an agency, established by the State of Louisiana for governmental purposes, and that it would be unreasonable to suppose that the State would hamper the operations of its own agent by requiring it to pay a tax; and that such intention becomes all the more improbable in view of the fact that the capital of the bank was expressly exempted from taxation during the continuance of its charter, and the exemption thus accorded has been held and construed by the various departments of the State government, from 1836 up to within a few years past, to include exemption from taxation such as is now sought to be imposed.
There is nothing in the pleadings upon the subject of the construction placed by the officers of the State upon the exemption granted to the bank; nor was any evidence offered bearing upon that subject, save the pleadings and judgments in the suits relied on to sustain the plea of res adjudicata, and they show, conclusively, that from 1878, up to the present time, the officers charged with the assessment and collection of taxes, have denied the exemption claimed by the bank on its capital, and have endeavored to compel it to pay taxes, and that, in some respects, the claim of the bank has been sustained, whilst, in other respects, it has not been sustained. Thus, the claim that it was exempt, with respect to mortgaged property bought in by it, appears to have been as urgently pressed as any other part of its demand, and yet the Supreme Court, in the case already cited (167 U. S.) says, upon the subject: “The record affirmatively shows that for many “years after the charter was adopted, the property acquired by the “ bank under foreclosure of mortgage was taxed like property of other “citizens, and the tax was voluntarily paid. ‘Indeed’ (says the “ court) ‘it was stated in the discussion at bar, and not denied, that “ the supposed right of the bank to exemption on property acquired by “it, under foreclosure of mortgage, was for the first time asserted “ in this suit, and that for the long series of years which had elapsed “ since the organization of the bank, that character of property was “regularly taxed, and the tax paid.’” And the judgment of the *1097 Circuit Court, decreeing such property exempt, was accordingly reversed. Eor' the purposes of the present case, therefore, we shall be unable to consider the effect of any supposed construction of thedaw under which the exemption is here claimed, or of any acquiescence in such contraction by the officers charged with the execution of the law. This suit was brought in 1894, for the collection of the license for the current year, amounting, as appears from the original opinion,' to $450.00. We should not, therefore, be called upon, even if the pleadings and evidence were other than they are, to deal with the question of giving a retrospective operation to a new and suddenly conceived construction of a law which had long been otherwise interpreted, and of thereby requiring the payment of a large sum for licenses, for years during which no one believed them to be due and no demand was made for their collection. When such a case is presented, it will be considered upon its merits, as was the case of the “State vs. The Comptoir National, etc., 51 Ann., 1272, which has been invoked. That case can not, however, be considered authority for the proposition that the State can be permanently estopped from enforcing the collection of its taxes by the previous acquiescence of its officers in a misconstruction of the law. Upon the contrary, express reference is made in the opinion to the fact that the future taxation of the defendant had been provided for, and it was found, moreover, that the statute under which the State claimed was inapplicable to the case.
Returning to the question; what should be presumed to have been the intention of the State, in view of the relations established between it and the bank by the act of 1836, and by other acts, subsequently passed? The main proposition advanced by counsel for the defendant relates to a supposed general understanding, in 1836, and is fairly summed up in the following statement, in one of their briefs:
“The idea that prevailed at the time the bank was established was that the enterprise was, in a certain sense, a State, rather than a private enterprise; that the carrying on of the business designed to be ■ carried on, was an inestimable boon to the State, not merely sanctioned by the State, but in which the State herself engaged. - It was inconsistent with the fundamental object of such an enterprise, the administration of which was controlled by the State, that it should be subjected to any license tax.”
*1098 There is no evidence before us as to the condition of public sentiment in 1836 concerning the enormous aid extended by the State to what all writers and jurists would concur in holding’ to be, and to have been, a private corporation. It is not doing violence to probabilities, however, to suppose that there were some persons, not connected. with the bank, who doubted the propriety of using the credit of the State in that way. At all events, the experience of the State, in aiding property banks, and other enterprises, would seem not to have been either pleasant or profitable, as may be inferred from the character of some of the provisions incorporated in the Constitutions adopted since that time. Thus, the Constitution of 1845, prohibited the State from subscribing to the stock of any corporation, and prohibited the creation, renewal, or extension of any corporate body with banking or discounting privileges, and restricted the power of the State, with reference to contracting debt, by provisions which were, at once, stringent and peculiar (Arts. 121, 122, 114). In the Constitution of 1852, there was some relaxation with regard to aiding corporations for works of public improvement, but those possessing banking or discounting privileges were especially excluded (Art. 109). And the Constitution of 1864 contained a similar exclusion (Art. 112). The Constitution of 1879 contained a number of provisions intended to guard the State against the encroachment of corporations, and, among others, one, prohibiting the loaning, pledging, or granting to them, of the “funds, property, or things of value of the State, or of any political corporation thereof” -(Art. 59). And a provision identical in language is to be found in the present Constitution (Art. 58). When we turn, for information, as to the relations between the Citizens’ Bank and the State, to the legislation upon the subject, we find a volume, beginning with the act of incorporation, in 1833, and extending over a period of nearly fifty years. The bank was started as a purely private venture, planned upon a large scale and contemplating the use of twelve millions of dollars in a variety of enterprises which seemed calculated to develop 'the resources of the State, and to put money into the pockets of its originators. There was no eleemosynary feature about it, and nothing that would conceal from an ordinary business man 'the fact that the resourses of the State were to be developed for no other immediate purpose than to promote the prosperity of the Citizens’ Bank and its incorporators. Even the mass of individuals comprising the public at large seemed *1099 to Lave been of that opinion, and the invitations extended to them to contribute were not accepted. Three years later, in 1836, therefore, the General Assembly was again appealed to, and another act was passed, the first section of which reads as follows:
“Be it enacted, etc., That, in order to facilitate the Citizens’ Bank of Louisiana in the negotiation of the loan of twelve millions of dollars, authorized by the act of incorporation of the first of April, 1833, the faith of the State is hereby pledged for the security of the said sum of twelve million dollars, or such part thereof as may be required by said bank.” This section is followed by others, establishing certain relations between the bank and the State, and the act itself was followed by numerous acts, the titles of which are indiees of the disasters which resulted from that relation. Within less than six years, the bank had obtained over six millions of dollars upon bonds furnished by the State; its entire scheme of development had been broken down; and its charter had been forfeited by judgment of court. Since then, and for nearly sixty years past, the Legislature and the courts have been afforded occupation in dealing with the wreck.
Section 3 of Act 92 of 1843, being “An Act to Facilitate the Liquidation of the Property Banks, Chartered by this State” reads: “Be it further enacted, etc., That the assets of the Consolidated Bank of the Planters of Louisiana and those of the Citizens’ Bank of Louisiana, are, and shall remain in the possession and under the exclusive management of the State of Louisiana until final payment, by each of them, of all the State bonds issued in their favor.”
In 1852, an Act was passed entitled “An Act for the relief of the Citizens’ Bank of Louisiana’’, being No. 141, the preamble to which Teads as follows: “Whereas, the State of Louisiana is now responsible for bonds issued in favor of the Citizens’ Bank of Louisiana for a sum exceeding six millions of dollars, together with accruing interest; and, whereas, the present condition- of said bank is such as to expose the State to loss from the inability of said bank to meet the payment of said bonds and interest, if the liquidation of the bank be continued on the system now established by law. And whereas, the managers appointed by the State for said bank have represented that the stockholders will be enabled to secure thea State from said risk of loss if they be restored to the control and management of the affairs of said bank, with the rights, privileges and immunities possessed by said bank at the date of the decree of forfeiture, rendered against it in the *1100 First District Court of New Orleans, now the Fifth District Court of New Orleans, on the eighteenth day of October, 1842”.
And the Act then vacates the forfeiture and restores the administration of the affairs of the bank to the stockholders. In 1853, another act was passed (No. 246) whereby, and for the purpose of enabling the bank to raise a million of dollars, as a working capital, it was authorized to convert ten thousand shares of its mortgage stock into cash stock, and the method of voting the stock was so changed as to give 'to the cash stock holders a larger voice in the directory, and' probably the control of the bank.
Again, after some intervening legislation, an act was passed, in 1874, whereby the charter of the bank was extended, from April 1, 1884, the date at which it would otherwise have expired, to January 1, 1911, and the bank was authorized, with the consent of the holders.' to extend the bonds, which had been issued to it by the State, for twenty-five years. And, finally, in 1880, still another act was passed (No. 79) authorizing the bank, with the consent of 'the bond holders, to compromise with the mortgage stock holders, and thus disengage, and disentangle, its banking department from its mortgage stock department. And this last act was accepted by the bank, November 6, 1880, agreeably to its terms, and under the conditions prescribed by Articles 234 and 237 of the Constitution of 1879, which read as follows:
Article 234. “The General Assembly shall not remit the charter of any corporation now existing, n-or renew, alter, or amend 'the same, nor pass any general or special law for the benefit of such corporation, except upon the condition that such corporation shall thereafter hold its charter subject to the provisions of 'this Constitution.”
Article 237. “No corporation shall engage in any business other than that expressly authorized in its charter, or incidental thereto, nor shall it take or hold any real estate for a longer period than ten years, except what is necessary and proper for its own legitimate business and purposes.”
Let us concede now, that the bank, as organized under the Act of 1836, is to be regarded as, in some sense, a governmental agency, for the carrying out, with the co-operation of the State, of the scheme of public benefaction proposed by jts organizers. We know that within six years from that time the whole scheme had disastrously failed, and that the State stood to pay six millions of its bonds, upon which *1101 tlie bank had realized the money, unless the amount could be made out of the assets of the bank, whose charter had, in the meanwhile, been forfeited by judicial decree. From that time to this, the State has been endeavoring to protect itself against loss, without inflicting hardship on the subscribers to the mortgage stock, or injustice on the creditors of the bank; whilst a certain class of the stock holders of the bank, to-wit, those who were able to contribute cash, as provided by the Act of 1853, have been endeavoring to save something for themselves. The efforts of the State have not been altogether successful, as the jurisprudence of this court shows. The cash stockholders of the bank, upon the other hand, have cast off the burden of the mortgage stock department, (which was to have developed the agricultural, etc., etc., resources of the State), and are operating a bank for their own benefit, which is an ordinary bank in everything except the exemptions which it claims, and which were granted to a different institution. And it is on behalf of the bank, so conducted, and not of the mortgage stockholders, that said claims are made.
Conceding, therefore, that the relations between the bank and the State, at one time, justified the exemption which is set up in this ease (although upon authority and precedent, the exemption from taxation of the capital did not carry with it the exemption of the occupation), the reason for such exemption has long since passed. away, and the original grant has long since expired.
In this situation, the following language used by this court in another case, may properly be applied:
“Of one thing we are assured, that the xolaintiff company has no right to consider itself aggrieved by our decision. The privileges claimed by it are mere incidents of a burthen said to have been imposed. They are not claimed as independent rights, but merely to enable it to discharge an onerous duty. Relieved, as she now is, of this duty, every claim of incidental right vanishes.”
N. O. & Carrollton R. R. Co. vs. City of New Orleans, 34 A., 444.
But there are still other reasons why the exemption claimed cannot be allowed. The Act of 1814, in so far as it extended the charter of the bank, from 1884 to 1911, was to take effect only in 1884; from which we deduce; first, that the extension thus granted could add nothing not authorized by the Constitution of 1868, under.the dominion of which the Act was passed, and which required the payment of a license; second, that the grant, to take effect in 1884, became *1102 subject tii the Constitution adopted in 1879, which also required, or authorized, the Legislature to require, the payment of the license. Gosselin vs. Gosselin, 7 N. S., 470; Mayor vs. Ripley, 2 La., 345. But, even if this were not so, the acceptance by the bank of the Act No. 79 of 1880, specifically, and in terms, subjected it to the Constitution of 1879, and thereby placed it out of the power of the Legislature to exempt it from the payment of the license imposed on other institutions of the same class. And neither the Supreme Court of the United States, nor this court, nor any other court, so far as we are informed, has ever decided to the contrary. The decision of the Supreme Court of the United States, to which we have been referred, did not affect the question here presented, because the issue as to the liability of the bank for a license was not before it, and it was so declared in the opinion and decree. Nor has the question of “license” ever been presented to this court. But, in the case of State ex rel. Citizens’ Bank vs. Board of Assessors, 48th Ann., 35, where the question to be determined was whether the bank was liable to taxation on mortgaged property bought in by it, it was distinctly decided, upon the application for a rehearing, that, by its acceptance of the Act of 1880, the bank brought itself under the provisions of the Constitution of 1879, Article 237, which prohibited corporations from holding real estate longer than ten years, etc.
Referring to the Act in question, the court said:
“That the Act was for the benefit of the corporation is made certain by the acceptance of the benefit of the Act, and the text of the same. Article 234 forbids the amending, or the altering of the charter of an existing corporation for the benefit of such corporation, except upon the condition that such corporation shall thereafter hold its charter subject to the provisions of the Constituton of 1879. Article 237, which the bank accepted, as governing its charter, provides that “no corporation shall *' * *” etc. The acceptance of the benefits of the Act bring this corporation under the provisions of the above article * * *. To hold that the property purchased is part of the banking capital would, in effect, be to repudiate this article of the Constitution, and to nullify the bank’s acceptance of the same.”
The acceptance of the bank, which is in the record, after a preamble, reciting the meeting of the stockholders, and-the vote cast, leads: “Therefore, resolved: That the .Directors of the Citizens’ Bank *1103 of Louisiana do hereby accept the aforesaid Act No. 79, and the Cashier is hereby instructed to file a certified copy of this preamble and resolution forthwith in the office of the Secretary of State, in accordance with, and as required by Article 4 of the said Act.”
The Secretary of State certifies that it was filed in his office on November 6, 1880.
Article No. 4 of the Act, to which the acceptance refers, reads:
“Further, that this Act shall not be binding, or confer any right upon the bank, unless accepted within twelve months from the date of this Act; and under the conditions prescribed in Articles 234 and 237 of the Constitution, such acceptance to be manifested by the bank in writing, and filed in the office of the Secretary of State.”
Not only does Article 234 of the Constitution prohibit the remission of the forfeiture, and the renewal, altering and amending of the charter of an existing' corporation, save upon the condition that such corporation shall “thereafter hold its charter subject to the provisions of this Constitution,” but it prohibits the passage of “any general or special law for the benefit of such corporation,” save upon the conditions mentioned.”
It seems impossible, therefore, successfully, to deny that the bank accepted the Act of 1880, and thereby deliberately entered izzto a contract with the State, under the Constitution of 1879; and equally impossible to deny that this court has so decided.
Now, whether the bank did, or did not, accept the Act of 1880; and whether or not this court has so decided; and if it did accept, in what manner the Constitution and laws of this State apply to the condition resulting therefrom, are not federal questions, but are questions arising under the Constitution and laws of this State, which this court, always actiizg with the greatest respect for, and under the established jurisprudence of, the higher tribunal, wihose authority has been invoked, feels bound to determine for itself. Bisland vs. Provosty, 14 A., 174; Bucher vs. Cheshire R. Co., 125 U. S., 555; First National Bank vs. Chehalis Co., 166 U. S., 440; Nobles vs. Georgia, 168 U. S., 398.
Finding no error in the original decree rendered herein, it is ordered, adjudged and decreed that it be re-instated, and now made the judgment of this court.
Watkins, J., concurring, handed down a separate opinion.
Breaux, J., and Blanchard, J., handed down separate dissenting opinions.